**In re DSC INDUSTRIES, INC., Debtor.**

**DSC INDUSTRIES, INC., Plaintiff,**

**v.**

**ROBERT SAGOT, INC., Defendant.**

**Bankruptcy No. 86–01839S.**
**Adv. No. 87–0727S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 3, 1987.

Edward Cohen, Philadelphia, Pa., for debtor.

Kent Cprek, Philadelphia, Pa., for defendant.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The instant Adversary proceeding is an accounts receivable action filed by a Debtor-in-Possession which was a subcontractor on a building contract against the general contractor on the contract for amounts which the Plaintiff charged for alterations from its initial undertaking. We shall award the Plaintiff the entire sum requested because we believe that the alterations were reasonably communicated to and hence implicitly accepted by the Defendant; were caused by circumstances beyond the Plaintiff's control; and, due to lack of privity of contract, would be unlikely to be recoverable by the Plaintiff from the building's owner.

This action was commenced on August 6, 1987. The Defendant filed an Answer and Counterclaim, which was in turn answered, and the matter came to trial before us on September 29, 1987. At the close of the trial, we issued an Order, dated September 30, 1987, permitting the parties to file Proposed Findings of Fact and Conclusions of

Law and any supporting Briefs on or before October 16, 1987. Since this is an Adversary proceeding, we are obliged per Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), to prepare our decision in the form of Findings of Fact and Conclusions of Law. We shall do so, setting forth a discussion of our legal analyses in the course of stating our Conclusions of Law.

### FINDINGS OF FACT

1. In early 1986, Camden County, New Jersey, (hereinafter referred to as "the Owner"), desired to construct a new correctional facility.

2. The Plaintiff became aware of this project and obtained a copy of the specifications for the manufacture of the one hundred and five (105) dining-hall tables to be constructed in the facility, which were to be modeled on standard models used by Southern Steel Company, which items the Plaintiff regularly produced.

3. The Plaintiff submitted a bid to the Defendant, a general contractor bidding on the commercial furnishings aspect of the contract. Both parties' bids were successful.

4. Although there was no formal written contract between the parties, the Plaintiff's undertaking was memorialized by a Quotation of February 19, 1986, and a totally-consistent written purchase order produced by the Defendant on May 5, 1986, on which the contract amount was designated as $72,661.00.

5. One condition of the agreement between the parties, which also was not reduced to writing, was that the Owner could test a sample table to determine whether it could be ripped out of the floor by inmates and used as a weapon within a certain time-frame. The initial sample table failed such a test conducted on May 30, 1986; the table was in fact ripped out of the floor and the table-top was bent within several minutes.

6. On June 20, 1986, the Plaintiff prepared and forwarded a Change Order form to the Defendant, which anticipated a change in floor anchors to attempt to correct the problems, at an additional cost of $2,650.00.

7. Another sample was prepared and another test was conducted by the Owner using the revised floor anchors in early July, 1986. Present at the site were, *inter alia*, Eric Berju, the Plaintiff's Vice–President in charge of sales, and Joseph Smiriglio, the Defendant's sales representative, both of whom testified at trial.

8. As before, the new sample table failed the test administered on it. Thereafter, the previous Change Order of June 20, 1986, was cancelled.

9. There is a dispute regarding discussions among the parties present at the facility—which included the Owner's Undersheriff and the Owner's architectural firm—immediately after this second test. Mr. Berju stated that he took Mr. Smiriglio aside and suggested that legs be placed under each seat, indicating that there would be an additional cost of $40.00 per unit or $4,200.00, for the legs alone. Mr. Berju also stated that the Owner's architect insisted that a certain other type of anchor bolt, utilized successfully in another facility, be utilized in this facility. Meanwhile, Mr. Smiriglio testified that Glen Kramer, the Plaintiff's Executive Vice–President, was present on behalf of the Plaintiff at this meeting rather than Mr. Berju and that, without discussing same aside with him, blurted out to the group that additional legs would be necessary and that the total cost for affixing same would be $4,200.00, which figure was firmly agreed to by all parties on the spot.

10. We credit Mr. Berju's version of this discussion. Mr. Smiriglio's recollection appeared in all respects less detailed, and we believe that he identified the wrong agent of the Plaintiff present. We also believe that it was unlikely that any agent of the Plaintiff could have been expected to make an estimate on the spot, or that they would have done so, or that they would have agreed to have been bound by such an estimate.

11. On October 22, 1986, the Owner agreed with the Defendant to alter the

table-contract by adding $4,200.00 in costs. There was no evidence that this agreement was ever communicated to the Plaintiff.

12. On October 24, 1986, the subcontractor performing the installations of the tables sent a Message/Reply note to Mr. Kramer recapping a meeting of October 21, 1986 (concerning which meeting no testimony was adduced), that confirmed that the Plaintiff would move and enlarge the holes in the legs for additional anchors. No cost figures were set out in the note, however.

13. On December 16, 1986, the Plaintiff forwarded a Change Order to the Defendant which contemplated an additional structure to the table top plate, at a cost of $2,100.00; additional legs, at a cost of $4,200.00; and charges for changing the holes on the floor anchors, at a cost of $6,460.00, for a total additional sum of $12,-760.00, bringing the total contract charges to $85,421.00.

14. The Defendant, per Mr. Smiriglio, denied receipt of this Change Order. Mr. Smiriglio also contradicted testimony of Mr. Kramer that there were conversations relating to the Change Order with Mr. Smiriglio in early 1987, which Mr. Kramer indicated that he understood as implicit acceptance of the figures on the Change Order. It is undisputed that the Change Order, like the June 20, 1986, Change Order, was not signed by the Defendant, nor was any written agreement of the Defendant to pay the additional $12,760.00 ever executed.

15. The testimony of Mr. Kramer that he sent the Change Order to the Defendant and later discussed the substance of the Change Order of December 16, 1986, with Mr. Smiriglio, was totally credible, as we think it likely that this dispatch and these discussions would have and therefore did take place. We do not credit the contrary testimony of Mr. Smiriglio.

16. The Plaintiff, assuming that approval had been given as to the December 16, 1986, Change Order, produced the tables as revised, and they were successfully installed in the Owner's facility in spring, 1987.

17. Through May 14, 1987, the Defendant submitted at a total of $75,045.00 to the Plaintiff, on an alleged remaining balance of $83,967.00, leaving an alleged net balance of $8,922.00.

18. Although the Defendant contends that it does not owe the $2,100.00 additional cost for revising the table tops due to its claim that the table tops did not conform to the original specifications for the tables, Mr. Smiriglio admitted on cross-examination that the tables *did* conform to the original specifications; and Mr. Berju contended, without rebuttal, that any changes from the Southern Steel Company model would have strengthened, not weakened, the table-tops.

19. The Defendant also contended that the Owner was entitled to receive the original sample table for use in its kitchen, and had charged it for $825.00 when no sample was produced. There was no evidence of any written or oral agreement regarding the planned ultimate disposition of the sample table. The Plaintiff indicated that it had the sample table in its possession and would give it to the Owner. The Defendant then indicated that the Owner may not want it because the top was bent.

## CONCLUSIONS OF LAW/DISCUSSION

1. This Court has jurisdiction over this proceeding. As a "garden-variety accounts receivable proceeding," it is a core proceeding. *See In re Windsor Communications Group, Inc.*, 67 B.R. 692 (Bankr.E.D.Pa. 1986). In any event the agreement of the parties to allow this Court to determine the matter authorizes us to do so. *See Holloway v. Heci Exploration Co. Employees' Profit Sharing Plan*, 76 B.R. 563, 570–71 (N.D.Tex.1987); *In re Wicaco Machine Co.*, 60 B.R. 415, 417 (E.D.Pa.1986); and *In re A.I.A. Indus., Inc.*, 75 B.R. 1013, 1017 (Bankr.E.D.Pa.1987).

2. The instant contract appears to be governed by the law of New Jersey, as the Defendant is a New Jersey corporation and the contract was performed in New Jersey. *See Neville Chemical Corp. v. Union Carbide Corp.*, 422 F.2d 1205, 1211 (3d Cir. 1970). However, we note no material respect in which the law of New Jersey dif-

fers from that of Pennsylvania, the forum state and the situs of the Plaintiff.

■ 3. There was no contractual privity between the Plaintiff and the Owner. Therefore, the only clear basis upon which either of the parties could assert a cause of action against the Owner for compensation for additional work and benefits to the Owner would be in an action brought against the Owner by the Defendant. *See, e.g., United States v. Blair*, 321 U.S. 730, 737, 64 S.Ct. 820, 823, 88 L.Ed. 1039 (1944); *Mitsui & Co. v. Puerto Rico Water Resources Authority*, 528 F.Supp. 768, 776–87 (D.P.R.1981); *In re Barrett*, 39 B.R. 792, 794 (Bankr.D.Minn.1984); and *Buckley & Co. v. State*, 140 N.J.Super. 289, 319–22, 356 A.2d 56, 73–75 (1975). The majority of cases do not allow even a *quantum meruit* claim to be asserted directly against an owner by a subcontractor unless there are equities in favor of the subcontractor, such as a reasonable belief that the owner was to be directly liable to the subcontractor. Annot., *Building & Construction Contracts: Right of Subcontractor Who Has Dealt Only with Primary Contractor to Recover Against Property Owner in Quasi Contract*, 62 A.L.R.3d 288, 294–95 (1985).

We therefore conclude that the Defendant's suggestion, at trial, that the Plaintiff has, at its disposal, an available remedy against the Owner based upon a *quantum meruit* theory does not appear well-taken. The Plaintiff's only practical remedy is against the Defendant. The Defendant meanwhile could, at any time, proceed against the Owner to recoup the Plaintiff's claim against it.

■ 4. The credible testimony of Mr. Kramer that the Plaintiff mailed the Change Order of December 16, 1986, to the Defendant, gives rise to a presumption that the Defendant received it. *See, e.g., Hagner v. United States*, 285 U.S. 427, 430, 52 S.Ct. 417, 418, 76 L.Ed. 861 (1932); *In re Callahan Motors, Inc.*, 538 F.2d 76, 79 n. 13 (3d Cir.1976); *National State Bank of Newark v. Terminal Construction Co.*, 217 F.Supp. 341, 355–56 (D.N.J.1963); and *In re Ryan*, 54 B.R. 105, 106–07 (Bankr.E.

D.Pa.1985). Moreover, proof of personal knowledge of the mailing by an agent of a business which mails its letters in the ordinary course of such business is unnecessary to sustain the presumption. *Meckel v. Continental Resources, Inc.*, 758 F.2d 811, 816–17 (2d Cir.1985); and *Wells Fargo Business Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 944 (5th Cir.1983).

The force of this presumption and our determination that the testimony of Mr. Kramer was more persuasive than that of Mr. Smiriglio on this point causes us to conclude that the Defendant did in fact receive the Change Order of December 16, 1986, well before the work was completed. Nevertheless, and despite the Defendant's exclusive knowledge that the Owner had only agreed to allow it $4,200.00 for the alterations, the Defendant chose to remain silent in order to cause the Plaintiff to assume that it would be compensated for all alternations billed in the Change Order and to therefore proceed to complete the job.

5. We do not believe that the production of the table-top deviated from the specifications. However, assuming *arguendo* that it did deviate to some degree, the Defendant, whose agent admitted on cross-examination that it did not so deviate, has failed to establish the requisite causation between any deviations and the fact that the table-top on the original sample bent. *See Havens Steel Co. v. Randolph Engineering Co.*, 613 F.Supp. 514, 528–30 (W.D.Mo. 1985).

■ It appears that the table designated in the original specifications for the job was simply not sufficient to withstand the Owner's tests. The extra $2,100.00 cost to produce a more sturdy table is certainly not the responsibility of the Plaintiff, but ultimately is that of the Owner. As indicated in paragraph three *supra*, only the Defendant has recourse against the Owner.

■ 6. Even where a contract specifically provides that a written change order from the general contractor is a prerequisite to allow compensation for additional charges to the subcontractor, this condition

is waived if the general contractor, by its conduct, allows the subcontractor to proceed under a reasonable assumption that it will be fully compensated for the changes. *See S. Leo Harmonay, Inc. v. Binks Manufacturing Co.*, 597 F.Supp. 1014, 1032–33 (S.D.N.Y.1984), *aff'd per curiam*, 762 F.2d 990 (2d Cir.1985); *E.C. Ernst, Inc. v. Koppers Co.*, 476 F.Supp. 729, 754–56 (W.D.Pa. 1979), *aff'd in pertinent part*, 626 F.2d 334, 330 (3d Cir.1980); and *In re Stanfield*, 9 B.R. 790, 795 (Bankr.D.Nev.1981).

■ Here, unlike in those cases, there was no initial comprehensive contract between the parties. Consequently, there was no contract clause requiring that change orders be in writing, or be approved by the Defendant, or be in any particular form. Thus, the Defendant's conduct of failing to respond to the Plaintiff's Change Order, discussing the changes with it in such a way as to give the Plaintiff the impression that it was accepted, and allowing the Plaintiff to complete the job assuming that it would be paid in full, bind the Defendant to pay for all of the additional charges specified in the Change Order. The Defendant's allegation of a "practice in the industry" that the change order must be signed by the general contractor before it is effective carries far less weight than the written contractual provision which was present in the contracts in issue in the cases cited in the foregoing paragraph, nevertheless, the courts, in each of those cases, allowed compensation for changes to the subcontractor.

7. The Defendant is liable to the Plaintiff in the amount of $8,922.00, the difference between the balance sought from the Defendant and the amount paid by it.

8. Since the Owner may have some use for the sample table, even in its damaged state, and the Plaintiff admittedly has it and has no need for it, it is equitable to condition the provision of relief sought by the Plaintiff on its delivery of this table to the Owner.