In re Van HUDERSON, Debtor.

Van HUDERSON, Plaintiff,

v.

U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT, Samuel R. Pierce, Jr., Secretary of HUD, Joseph Russell, Chief Loan Management Branch, Philadelphia Area Office Bankers Mortgage Corporation, William Schaps, Trustee, Defendants.

Bankruptcy No. 84–01172S.
Adv. No. 84–0582S.

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 16, 1989.

Michael Donahue, Community Legal Services, Inc., Philadelphia, Pa., Roger V. Ashodian, Delaware County Legal Assistance Ass'n., Inc., Chester, Pa., for plaintiff-debtor.

Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa., for Government-defendant.

Joseph Goldbeck, Philadelphia, Pa., for defendant-Bankers Mortg. Corp.

William Schaps, Philadelphia, Pa., Defendant–Trustee in closed Chapter 7 case.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding marks the second occasion on which we have been called upon to review a refusal by the United States Department of Housing and Urban Development (hereinafter referred to as "HUD") to grant an application by a debtor-mortgagor for an assignment of a federally-insured mortgage to HUD, pursuant to Regulations set forth at 24 C.F.R. §§ 203.-650, *et seq.* In our previous decision in this area, *In re Zaidi,* 78 B.R. 410, 411–12 (Bankr.E.D.Pa.1987), the HUD Mortgage Assignment Program is described in detail, and that description need not be repeated here.

Significant to our resolution here is a desire to bring this matter to a close, as the underlying facts occurred over six years ago, and this proceeding itself is fast approaching its fifth anniversary. We can discern no logical reason why HUD persists in denying this application, not because the undisputed factual recitations of the Debtor do not justify same, but because these recitations are not backed up by complete written documentation. Moreover, the Debtor describes the reasons for the absence of which documentation the Debtor also explains at length. Therefore, taking what we believe was a direct cue from distinguished District Judge Louis H. Pollak, who remanded an affirmance of HUD's decision by this court back to us, we proceed to bring this matter to a close. We herein remand this the application once

again to HUD, but with instructions to process the Debtor's underlying long-sought application for the assignment.

## B. PROCEDURAL HISTORY

On April 12, 1984, the Debtor filed the Chapter 7 petition which originally spawned this proceeding. On May 14, 1984, he filed the complaint in this proceeding to review HUD's initial administrative decisions of June 16, 1983, and December 16, 1983, denying his HUD mortgage assignment request. The vitality of this proceeding is attested to by our observing that the underlying Chapter 7 case was brought to an end and closed on September 28, 1984. This proceeding was at that time in its infancy: the parties were in the midst of briefing cross-motions for summary judgment for the first of what turned out to be three occasions.

In response to these motions, our predecessor, the Honorable William A. King, Jr., entered the first of two prior Orders remanding the matter to HUD on September 5, 1985. HUD's only response to this remand was to file, on December 11, 1985, an affidavit of Juanita P. Collins, the HUD Loan Officer responsible for the 1983 decisions, in order to further explain those decisions. Cross–Motions for Summary Judgment were thereafter filed for the second time, and Judge King granted HUD's motion and affirmed its denial of the assignment without opinion on March 31, 1986.

The Debtor timely appealed this decision to the District Court. By Order and Bench Opinion entered June 27, 1988, Judge Pollak vacated this court's Order of March 31, 1986, and remanded the matter to this court for proceedings consistent with the Bench Opinion. We note that, while this appeal was pending, the Debtor filed a new Chapter 13 bankruptcy case on December 18, 1986, and staved off loss of his home by attaining confirmation of a Chapter 13 Plan of Reorganization on July 22, 1987.

Meanwhile, after conferencing the matter with both parties on August 24, 1988, this court, by agreement of the parties, remanded the underlying matter to HUD for a second time, specifically instructing HUD to issue a new determination by October 28, 1988, and scheduling a further status conference on November 3, 1988. On October 26, 1988, HUD issued another decision, *again denying* the requested assignment.

By an order entered after the conference on November 3, 1988, we listed the matter for trial on December 15, 1988, allowing HUD to brief a contention which it made immediately after the remand from the district court and we agreed that it could preserve, that dismissal of the underlying instant main case mandated dismissal of this proceeding as well. In a Memorandum of December 12, 1988, we rejected HUD's contention in this regard, relying upon *In re Stardust Inn, Inc.*, 70 B.R. 888, 890–91 (Bankr.E.D.Pa.1987); *In re Pocklington*, 21 B.R. 199, 202–03 (Bankr.S.D.Cal.1982); and *In re Lake Tahoe Land Co.*, 12 B.R. 479, 480–81 (Bankr.D.Nev.1981). *Accord, In re Smith*, 866 F.2d 576, 580 (3d Cir. 1989) (reasoning of *Stardust Inn* approved and adopted in similar circumstances).

The apparently indefatigable parties then renewed their cross-motions for summary judgment for the third time. The briefing was completed on January 24, 1989. The Debtor, perhaps unable to face the prospect that this matter might end, filed a motion to keep the record open in order that a Bench Opinion of Judge Pollak of December 31, 1985, in *O'Neill v. United States Dep't of HUD*, C.A. No. 85–1205 (E.D.Pa.), could be transcribed. We acquired a copy of this Bench Opinion prior to filing this Opinion. Accordingly, the Debtor's motion is moot.

## C. THE FACTS PRESENTED BY THE ADMINISTRATIVE RECORD

In November, 1978, the Debtor purchased his home at 226 West 22nd Street, Chester, Pennsylvania, and financed it with a HUD-insured mortgage from BANKERS MORTGAGE CORPORATION (hereinafter "Bankers"). The Debtor defaulted on this mortgage in November, 1982, and Bankers notified the Debtor of the possibility of foreclosure. At that time, the Debtor's

family included his common-law wife, Carolyn Davis, her 14–year–old daughter, and his four-year-old daughter by Ms. Davis. When the Debtor failed to cure the default, Bankers reviewed the Debtor's eligibility for a HUD assignment and determined that the Debtor failed to meet the requirements for a HUD assignment, pursuant to 24 C.F.R. § 204.652(b). Bankers then notified the Debtor of its reasons for declining an assignment recommendation and further notified the Debtor that he could contact HUD directly to ask that HUD accept the assignment. *See* 24 C.F.R. § 203.652(c); and *Zaidi, supra,* 78 B.R. at 411.

In March, 1983, the Debtor requested that HUD accept an assignment of his mortgage pursuant to 24 C.F.R. § 203.652(b). HUD sent the Debtor the appropriate forms to complete and submit by letter dated March 11, 1983. The Debtor's response via the forms stated that his default occurred because he had suffered a loss in household income of $560.00 per month starting in August, 1982, due to his wife's unemployment. He further advised that he himself had been laid off as of March 1, 1983, but thought his prospects for resuming work were good. By letter dated April 22, 1983, HUD notified the Debtor, pursuant to 24 C.F.R. § 203.654(c), that its preliminary review indicated that it would not accept an assignment of his mortgage. However, the letter invited the Debtor to schedule a conference and attempt to provide information to further establish his eligibility for an assignment. *See id.*

On May 19, 1983, a conference was held, attended by the Debtor, Ms. Davis, and a lay housing counselor. The conference was conducted by HUD Loan Officer Collins, and the Debtor and Ms. Davis presented oral statements and supplied Ms. Collins with various bills and records pertinent to their circumstances. *See* 24 C.F.R. § 203.656.

On June 16, 1983, HUD sent the Debtor a brief notice of its initial "final" decision of assignment request. *See* 24 C.F.R. § 203.658. Therein, HUD stated that it had denied the Debtor's request for assignment because the default was not caused by circumstances beyond the Debtor's control, as required by 24 C.F.R. § 203.650(a)(5). The key statement in that letter is the finding that "Mr. Huderson's income was sufficient to meet monthly mortgage payments" as of the time that the default began in November, 1982, and hence that his subsequent layoff was irrelevant. No analysis of Ms. Davis' unemployment was provided, apparently because it was believed that, since the Debtor's income was sufficient to make the payments, this factor was irrelevant also.

In August, 1983, the Debtor apparently contacted counsel for the first time. In a letter of August 25, 1983, counsel emphasized that, due to "medical difficulties and a pregnancy," the income of "Mrs. Huderson" of $560.00 monthly had been lost to the household in August, 1982, and this circumstance was the primary cause of the delinquency. In a later letter of November 8, 1983, the Debtor's counsel attempted to dispel a misunderstanding on Ms. Collins' part, which she had apparently communicated to him, that Ms. Davis' lay off had occurred in 1981. He explained that, after her lay off from "Robins" (Rob–Anne) Sportswear in May, 1981, Ms. Davis had collected unemployment compensation through March, 1982, and thereafter regained employment at Clifton Sportswear in July, 1982. It was stated by counsel that the loss of this *latter* employment in August, 1982, was contended by the Debtor to be the basis for the mortgage-payment delinquency.

The responsive letter of December 16, 1983, from HUD, which reaffirmed the earlier final decision of June 16, 1983, and originally set off this proceeding, does not appear to dispute the claims that the Debtor's household suffered a loss of income as a result of Ms. Davis' employment. Rather, it questions whether certain expenses of the household, *i.e.,* medical expenses for Ms. Davis, a legal bill of the Debtor, and $200.00 monthly costs for electricity, gas, and oil, were sufficiently documented.

The next substantive administrative document was the submission of the Affidavit

of Ms. Collins on December 11, 1985. Therein, Ms. Collins stated that she had analyzed the net monthly income of the Debtor, as of November, 1982, to be $1,393.00, and that this amount should have been sufficient to meet the documented monthly family expenses, which Ms. Collins apparently pegged at around $1,100.00, counting the mortgage payment. Mention is made of Ms. Davis' loss of employment and unemployment compensation in August, 1981, and April, 1982, respectively, but no further analysis is apparently presented due to Ms. Collins' conclusion that the Debtor's income was alone sufficient to make the mortgage payment.

The final administrative proceedings transpired as a result of our Order of August 24, 1988, again remanding the matter to HUD. As a result of that Order, a conference was scheduled on October 17, 1988, at which the Debtor, Ms. Davis, and the Debtor's counsel all appeared. At that time, the Debtor and Ms. Davis submitted a lengthy joint affidavit, explaining the entire history of Ms. Davis' employment, and setting forth the Debtor's income and all expenses of the household as of November, 1982, in detail. Therein, the Debtor contended that his average monthly net pay, as of November, 1982, was $1,138.00 and that the family's monthly household expenses at the time, exclusive of the mortgage, were $1,169.46. With the $344.52 monthly mortgage payment, monthly expenses totalled $1,513.98.[1] Numerous documents are attached to the affidavit to support the figures submitted and, in each instance where documentation is not provided, reasons for the failure of production are recited. Regarding the Debtor's own income, which is not documented, it is noted that he did construction work out of a union hiring hall and records could not be obtained from the various employers to which he was assigned to work at that time. Regarding Ms. Davis' income, also not documented, it is averred that both Rob–Anne Sportswear and Clifton Sportswear are out of business and no records could be obtained therefrom. Income tax returns for both years were said to not have been retained and it was indicated that they are too dated to be obtained from the Internal Revenue Service. Documentation of Ms. Davis' medical problems and bills are said to be unavailable because the doctors' bills were discharged in the Debtor's Chapter 7 bankruptcy and, consequently, the doctors refused to cooperate in providing them. Attempts to obtain copies of utility bills and other receipts for expenses are described. Documentation of the birth of a son of the couple on May 9, 1983, is provided, verifying Ms. Davis' pregnancy.

The final decision of HUD, dated nine days after the conference, recites the following as the most significant reasons for its continued refusal to grant the assignment:

1. No "verification" of Ms. Davis' income or her reasons for leaving Rob–Anne Sportswear or Clifton Sportswear was provided.

2. No documentation of Ms. Davis' medical problems was provided, further embellished by the statement that "pregnancy alone, its expenses, or wage lost on

---

1. Although the Debtor's counsel recites these figures as $1,401.00 and $1,745.52, respectively, in his present Brief, apparently on the basis of submissions by the Debtor in 1983, we calculate the figures as follows from the Affidavit of October 17, 1988, which presumably the Debtor is now arguing is more precise than the earlier submissions:

| | |
|---|---|
| Food | $ 400.00 |
| Clothing | 85.00 |
| Water | 18.00 |
| Sewer | 11.67 |
| Electric | 40.30 |
| Gas | 27.48 |
| Phone | 35.66 |
| Kerosene (for Heat) | 167.00 |
| Life Insurance | $ 23.00 |
| Car Insurance | 58.85 |
| Child Support | —— ($30.00 already deducted from pay) |
| Medical Expenses | 100.00 |
| Household Maintenance | 20.00 |
| Loan | 32.50 |
| Auto Expenses | 150.00 |
| SUB–TOTAL | $1,169.46 |
| Mortgage Payment | 344.52 |
| TOTAL | $1,513.98 |

account thereof [are not] qualifying circumstances for assignment."

3. "Failure" to provide wage records or tax returns, making it "impossible" to determine the income of the Debtor and Ms. Davis and therefore determine whether their loss of income caused the delinquencies.

4. No "proof" or "evidence" of relevant medical expenses was provided.

5. Due to the failure to "verify" the income of the Debtor or Ms. Davis and in the absence of "proof" of many expenditures, HUD "cannot determine from the information provided" that the Debtor had met the requirement of 24 C.F.R. § 203.650(a)(5).

D. WHILE WE RECOGNIZE THAT THE STANDARD OF REVIEW OF HUD'S ASSIGNMENT DECISIONS IS APPARENTLY NARROW, IN DECIDING THIS CASE WE MUST FOLLOW THE DIRECTIVES OF JUDGE POLLAK TO REVIEW THE SPECIFIC FINDINGS OF HUD REGARDING THE MONTHLY INCOME AND EXPENDITURES OF THE DEBTOR'S FAMILY

Although the Third Circuit Court of Appeals, in *Armstead v. United States Dep't of HUD*, 815 F.2d 278, 280–81 (3d Cir.1987), indicates that there is some doubt on the point, we will assume, as the court did there, that the standard upon which we may review a determination by HUD that an assignment request should be denied is whether the decision, by HUD, was "arbitrary and capricious." *Id.* at 281, 282. *Accord, e.g., Zaidi, supra,* 78 B.R. at 413–14.

However, application of this standard is tempered by the observation that the assignment program "is the product of litigation which began in 1973 over HUD's failure to adequately supervise mortgagees in Chicago, *Brown v. Lynn,* 385 F.Supp. 986 (N.D.Ill, 1974)." *Id.* at 412. The assignment program was, therefore, part of a court settlement, which placed HUD in the unusual position of involuntarily promulgating a program to remedy its own deficiencies. *See Ferrell v. Hills* (the same

case as *Brown v. Lynn* ), Civ. No. 730334 (N.D.Ill. Feb. 13, 1973). Moreover, we note that litigation challenging HUD's failure to adequately service its insured mortgages was instituted in the Philadelphia area as well as in Chicago. *See Davis v. Romney,* 355 F.Supp. 29 (E.D.Pa.1973), *aff'd in part and rev'd in part,* 490 F.2d 1360 (3d Cir. 1974). Perhaps in acknowledgement of this history of the HUD mortgage-assignment program, the Court of Appeals in *Armstead,* observes that "sympathetic consideration" must be given to "a citizen whose plight, together with that of many others, led Congress to enact the remedial statute which HUD must implement." 815 F.2d at 283. It therefore behooves us, in reviewing HUD's determinations under a program adopted to correct HUD's *own* shortfalls in administration of its assignment program, to carefully review HUD's decision-making process and decisions under this program.

We note that this is a program which contains numerous procedural pitfalls for mortgagors who seek to participate in it, including a short time period of 15 days to request participation in it, 24 C.F.R. § 203.652(b), and a requirement of the mortgagor to bear the burden of convincing HUD to act favorably on the assignment request under procedural and substantive guidelines which are both rather vague. If vague procedures and substantive mandates permit HUD to formulate strict and narrow rules for allowing assignment requests, the result could be a reversion to the very ill which the HUD assignment program was enacted to cure, *i.e.,* precipitous foreclosures of HUD-insured mortgages, to the detriment of mortgagors and HUD alike. In the aura of the present times, with homelessness a pervasive social problem, HUD would appear to be under a mandate to interpret these regulations liberally. Thus, the courts must be vigilant in reviewing whether HUD's denials of assignment requests, on either procedural or substantive grounds, are in fact "arbitrary and capricious," in light of the history and benefits provided by the assignment program.

■ The Bench Opinion of Judge Pollack exemplifies such vigilance. In any event, on remand, we are bound to adhere to unappealed directives of Judge Pollak recited in his Bench Opinion of June 24, 1988. *See, e.g., Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 833–34 (9th Cir.1982); and *Cherokee Nation v. Oklahoma,* 461 F.2d 674, 677–78 (10th Cir.1982), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1973) (decision and contents of the Order and the Opinion of an appellate court are the "law of the case" upon remand to the lower court).

Initially, Judge Pollak questions the basis for HUD's determination that the Debtor's net monthly income is $1,393.00, as opposed to about $1,100.00, as argued by the Debtor. Bench Opinion, at 8–9, 4. He also questions HUD's calculations of the family's monthly expenditures. *Id.* at 9–11. In addition to expressing skepticism regarding the substance of HUD's determination that the living expenses of a family of four could be as low as $748.00 monthly, exclusive of the mortgage payment, *id.* at 6, as apparently HUD argued, Judge Pollak is troubled by HUD's inconsistencies in requiring only certain expenditures to be documented in a manner defying any pattern or rational basis. *Id.* at 10–12. For instance, he finds it "hard to suppose that it is HUD's position that an ordinary lower-middle class budget would not contemplate medical expenditures ..., and ... clothing," which HUD declined to consider since it was undocumented, and queries under what "groundrules" HUD was operating in this regard. *Id.* at 12. Consequently, he remands the matter to us with a specific directive that we make findings regarding the income and expenditures of the Debtor's family, either on the present record or after a further administrative remand. *Id.* at 14–15.

The matter has of course now had another visit to the administrative forum and we have a very complete record on which to make findings on this score. We believe that Judge Pollak's directives require us to critically review HUD's determinations as to income and expenditures of the family, irrespective of whether such intense and critical review of HUD's determinations falls within the normal contours of a judicial review to determine whether HUD's decision was "arbitrary and capricious." We must, therefore, proceed with such an analysis here.

E. NEITHER THE PERTINENT HUD REGULATIONS NOR HANDBOOK, NOR THE ORDINARY PRINCIPLES OF THE LAW OF EVIDENCE, REQUIRE AN APPLICANT FOR AN ASSIGNMENT OF A HUD MORTGAGE TO DOCUMENT EVERY FACTUAL ALLEGATION ASSERTED BY THE APPLICANT

■ Before returning to the particular aspects of the income and expenditures of the Debtor which we must analyze, it is important to review the specific Regulations and HUD Handbook directives which are pertinent to the issue of necessary documentation, because it is apparent that an applicant should ordinarily adhere to any such directives.[2] The Regulations[3] recite the following criteria for assignment of HUD-insured mortgages to HUD, at 24 C.F.R. § 203.650:

ASSIGNMENT OF MORTGAGES TO HUD

§ 203.650 Assignment of mortgages.

(a) The Secretary will accept assignments of mortgages insured under this part in order to avoid foreclosure when the following conditions are met:

2. The establishment of the HUD mortgage assignment program is supported by legislation appearing at 12 U.S.C. § 1715u. However, there is little procedural or substantive guidance in the statute.

3. Reference is made throughout to the HUD Assignment Regulations in their present form. We are aware that in 1987, during the pendency

of this extended matter, these Regulations were amended. At present, however, we are only reviewing HUD's decision of October 26, 1988, which superseded all others. In making this determination, we assume that HUD applied the present Regulations. Therefore, we refer to the present Regulations in effecting our review of this decision.

(1) The mortgagee has informed the mortgagor that it intends to foreclose the mortgage.

(2) At least three full monthly installments due on the mortgage are unpaid after application of any partial payments which may have been accepted but not yet applied to the mortgage account.

(3) The property is the mortgagor's principal place of residence. This criterion may be waived by the Secretary if the property has been leased or rented and the rental income has been applied to the mortgage delinquency or to effect repairs necessary to maintain the property in a safe and habitable condition or if such waiver is determined to be in the best interests of the Department.

(4) The mortgagor does not own other property subject to a mortgage insured or held by the Secretary. This criterion may be waived by the Secretary if the income from such other property is the mortgagor's principal source of income.

(5) The mortgagor's default has been caused by circumstances beyond the mortgagor's control which render the mortgagor unable to correct the delinquency within a reasonable time or make full mortgage payments.

(6) There is a reasonable prospect that the mortgagor will be able to resume full mortgage payments after a period of reduced or suspended payments not exceeding 36 months and will be able to pay the mortgage in full by its maturity date extended, if necessary, by up to ten years.

(b) A mortgage shall not be eligible for assignment in any case where:

(1) The mortgaged property has been abandoned or vacant for more than 60 days.

(2) The mortgagor, after being clearly advised of the options available for relief, has clearly stated in writing that he has no intention of fulfilling his obligation under the mortgage; or

(3) The mortgagee is prevented by law from initiating foreclosure of the mortgage.

(4) The mortgagor owns two or more properties occupied by tenants who are paying rent, and the rental income from the property under review is not being applied to the mortgage on that property.

At present, the only issue is whether the Debtor meets the criteria of 24 C.F.R. § 203.650(a)(5). It is apparently agreed that all other requirements have been met.

The threshold procedural issue—and perhaps the determinative issue in the entire controversy—is what requirements are placed upon a mortgagor to establish that, in fact, a default was caused by circumstances beyond the mortgagor's control.

The Regulations fail to provide any specific documentation requirements. The only indications that mortgagor must furnish documentation are found, as follows, at 24 C.F.R. § 203.654(a):

> The mortgagee and mortgagor shall promptly furnish to the Secretary all of the information requested to assist in a preliminary determination of whether or not to accept an assignment of the mortgage.

This section does not specifically require that the "information" required must be in the form of documents. Also, 24 C.F.R. § 203.654(c) specifically allows the mortgagor to present additional information or argument by mail or by telephone, negating any inference that all evidence must be written. Additionally, 24 C.F.R. § 203.656 describes the conference which the mortgagor may attend. This section specifically provides that the conference is not an adversary proceeding and applicants are not required to abide by any formal rules of evidence. Most significantly, this section allows the mortgagor to present "*oral and documentary information*" to HUD at the conference (emphasis added).

HUD also supplies its agency offices with a HUD Handbook to guide its employees in administration of these Regulations, entitled Administration of the Home Mortgage Assignment Programs, No. 4330.2 (Jan., 1979, as reprinted June, 1988). This Handbook also fails to provide any explicit requirements for documentation. In the sections concerning income verification, the

strongest statement in this regard is that "[w]hile *not mandatory*, Field Offices *may* request any additional verification necessary to assure the accuracy of information submitted by the mortgagor." HUD Handbook 4330.2, § 4–5(c)(3), at 4–5 (emphasis added). The Handbook further states that, "[i]f the Field Office does not receive verification of income from its source or evidence of income from the mortgagor, or any other information which it has requested, it will determine eligibility for assignment *based on the information that is available*." *Id.* § 4–5(c)(4) at 4–5 (emphasis added).

In the instant case, the Debtor has supplied a good deal of information to HUD in order to facilitate his assignment request. He began by completing the forms supplied by HUD and the mortgagee concerning the conditions for assignment, employment information, expenses, and reasons for default. The Debtor was represented by a housing counselor at the initial conference with HUD and brought further information, including pay stubs, utility bills, medical bills, and other records of expenses to the conference. While the Debtor failed to document all of his expenses with paid receipts or cancelled checks, Ms. Collins accepted undocumented expenses for the Debtor's home maintenance, food, and transportation. Yet, as Judge Pollak points out, Bench Opinion, at 10–11, she arbitrarily refused to allow the Debtor's expenses for clothes and heating oil because they were undocumented. In the Affidavit presented at the last conference on October 17, 1988, the Debtor and Ms. Davis gave full explanations for their inability to obtain any more of the requested documentation than what was provided. Yet, rather than rendering its decision on the basis of the information available, HUD determined that the failure to provide documentation justified denial of the Debtor's application. In fact, pursuant to the last decision, on October 26, 1988, absence of documentation was the *sole* reason for HUD's conclusion that the family's expenditures did not exceed their income to the extent that loss of Ms. Davis' income was found to constitute a circumstance beyond their control, which caused their mortgage default, pursuant to 24 C.F.R. § 203.650(a)(5).

Since the Regulations and Handbook impose no specific nor extraordinary requirements of documentation, we turn to general principles of the law of evidence to determine whether they support HUD's decision that the Debtor's inability to fully document all of his income and expenditures should have justified refusal to accept the representations of both Ms. Davis and him relevant thereto.

Generally, contemporaneous documentary evidence is more satisfactory than oral proof because of "the well-known fallibility of memory of witnesses." 30 AM.JUR.2d 247 (1967). However, testimony of witnesses cognizant of the facts of which they speak is the traditionally accepted alternative form of providing evidence. *Id.* at 247–48.

It is clear that the testimony of even an interested witness may alone be competent evidence to support a particular adjudicative result. *College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 111, 360 A.2d 200, 204 (1976); and *In re Estate of Elias*, 429 Pa. 314, 320–21, 239 A.2d 393, 396 (1968). *Accord, Perry v. Manocherian*, 675 F.Supp. 1417, 1425 (S.D. N.Y.1987). If such testimony is uncorroborated, this is relevant only to the weight to be given by the fact-finder to such testimony. *Guriel v. Scott*, 201 Pa.Super. 58, 60–61, 191 A.2d 856, 857 (1963).

Non-production of documentary evidence which is in the particular control of a party is a circumstance which permits an inference to be drawn against that party. 14 P.L.E. 321 (1959). However, no adverse inference from non-production of documentary evidence can be drawn when the relevant documentary evidence is not actually in the control of the party who fails to produce it. *Atlantic Sugar, Ltd. v. United States*, 553 F.Supp. 1055, 1059, 4 C.I.T. 248 (1982); *Wilson v. Pennsylvania R.R.*, 421 Pa. 419, 425–26, 219 A.2d 666, 670 (1966); and *Rosenthal v. Ostrow*, 287 Pa. 87, 91, 134 A. 384, 385 (1926).

Here, HUD refuses to accept the statements of the Debtor and Ms. Davis simply because they are undocumented. The failure to accept their statements and affidavit, which are the analogue to testimony in this record, as having any weight at all, is contrary to the principle that testimony of even interested witnesses is always admissible evidence. Moreover, the absence of documentation, even if such documentation would normally be in the particular control of the Debtor and Ms. Davis, should not be utilized to totally discount their statements. All that the absence of such documentation would justify is an adverse inference against these statements. Moreover, unless the explanations for nonproduction of documents because they were not in the possession of the Debtor and Ms. Davis are discredited, not even an adverse inference should be drawn against the Debtor for non-production of same.

We do not mean to imply that HUD is compelled to accept whatever applicants for assignments tell them. It is clearly proper for HUD to request verification of certain information, particularly when an applicant's assertion seems questionable on its face or is inconsistent with an applicant's prior declarations. However, here, HUD does not quarrel with the reasonability of any of the assertions of the Debtor and Ms. Davis in their Affidavit of October 17, 1988, and neither do we. Nor does it contend that these declarations are inconsistent with any made by them at any previous time in the lengthy administrative process.

We note that affidavits such as that submitted by the Debtor and Ms. Davis on October 17, 1988, have regularly been found acceptable as significant evidentiary documents in HUD assignment application proceedings, here and elsewhere. Thus, in *Armstead, supra,* 815 F.2d at 281–82, the applicant's appeal was apparently decided solely on a record consisting of counter-affidavits. HUD is, moreover, taken quite rigorously to task by the Court of Appeals there for preferring to credit its "usual practice" over the specific allegations by the applicant, in her affidavit, that this practice was not followed in her particular instance. *Id.* at 282. Further, HUD is therein chided for failing to react affirmatively to the "unrefuted representations" made by the mortgagor, even though such representations were not supported by any documentary evidence. *Id.* at 283.

Here, we note that HUD itself, on the occasion of the first remand to it, responded with only an affidavit, from Ms. Collins, on December 11, 1985. This affidavit was proffered, successfully before Judge King, as the *sole* additional evidentiary basis upon which HUD claimed that its original decision was supported.

Obviously, then, an affidavit is an acceptable evidentiary tool in the HUD assignment application process. We fear that, in rejecting the contents of the October 17, 1985, affidavit, HUD not only trampled on several principles of the law of evidence, but reverted to the same sort of "administrative blindness" that pervaded its "obstinate course," 815 F.2d at 283, in *Armstead.* Such a course of action can only be classified as "arbitrary and capricious."

F. WE ACCEPT THE CONTENTS OF THE AFFIDAVIT OF OCTOBER 17, 1988, AND, FINDING HUD'S ARGUMENTS TO THE CONTRARY UNPERSUASIVE, CONCLUDE THAT THE DEBTOR MEETS THE REQUIREMENTS OF 24 C.F.R. § 203.650(a)(5)

Our foregoing analysis causes us to reject HUD's analysis that the contents of the affidavit of October 17, 1988, submitted by the Debtor and Ms. Davis must be rejected out of hand because they are not supported by documentary evidence. Furthermore, we find the contents to be entirely believable and uncontroverted by any other evidence of record. Hence, we accept the contents of the affidavit as true. Consequently, we are prepared to accept the statement contained therein that the family's net income, as of November, 1982, was $1,138.00. We also accept the averments which add up to a contention that the family's monthly expenditures were $1,169.46, not counting the mortgage, and $1,513.98, if the mortgage is included. Fi-

nally, we also accept the averment that, as of August, 1982, the family was deprived of the previous income of $560.00 provided by Ms. Davis, and that this loss of income was the result of her illness and pregnancy, which were circumstances beyond the Debtor's control. Nothing in the Regulations or the reported cases or logic supports HUD's apparent contention that the expenses attendant with normal childbirth should never be considered a circumstance beyond a woman's control which could justify a mortgage delinquency. We decline to accept the "anti-life" principles suggested by HUD that a pregnancy can never be considered a circumstance beyond a woman's control, and that a woman should have to "choose" between bearing a child or losing the home in which she and the child otherwise hope to live. *Cf. O'Neill, supra* (woman's desire to leave work and remain home to care for children with special needs is not a "voluntary" decision subject to her control); and *James v. United States Dep't of HUD*, C.A. No. 4–81–457 (D.Minn.1982) (woman's changing jobs to be able to take care of two young grandchildren upon their parents' incarceration was not a "voluntary" decision).

█ In its Brief in support of its motion for summary judgment, HUD presents several arguments which are worthy of some comment. First, it suggests that the Debtor has been inconsistent regarding his statements of the reasons for Ms. Davis' leaving work, reciting a layoff at certain points and sickness and pregnancy at others.[4] However, we believe that the tortuous history of Ms. Davis' employment status in 1981 and 1982 (lay off, unemployment compensation, new employment, forced to leave new employment) was complicated and difficult to totally explain in the limited space included in the form. It was explained in detail in the affidavit of October 17, 1988. Moreover, attributing her loss of income to a layoff was not technically incorrect. The layoff in 1981 was a factor in Ms. Davis' not being eligible to receive unemployment compensation benefits in 1982, because apparently those benefits were by that time exhausted due to the 1981 layoff. In any event, either of the stated bases for loss of Ms. Davis' income were, in our view, circumstances beyond her control. The important factor is that, due to the reduction of her earnings of $560.00 monthly in the family's income, its income was reduced from a sum sufficient to pay all of the household bills, including the mortgage, to a sum less than the total monthly bills, excluding the mortgage, which inevitably resulted in a mortgage default.

█ Secondly, HUD points to the fact that Ms. Davis' son was not born until May 9, 1983, and therefore would have barely have been conceived by the time that she left work due to the "difficulty" of her pregnancy in August, 1982. However, as we read the affidavit of the Debtor and Ms. Davis, it appears that Ms. Davis originally left work because of a bout of sarcoidosis, which apparently became manifested prior to or about the time of her pregnancy, and thereafter began to suffer, in addition, from a difficult pregnancy. This is not surprising in the case of a woman bearing a child at age 36, and it appears logical that this combination of physical problems would render her incapable of performing her relatively physically rigorous position as a garment-factory worker.

Finally, HUD claims precedent for a decision in its favor from the decisions in *Pinder v. United States Dep't of HUD*, C.A. No. 85–3684 (E.D.Pa. Dec. 5, 1985) [1985 WL 4284]; *McCall v. United States Dep't of HUD*, C.A. No. 85–1300 (E.D.Pa. Sept. 25, 1985) [1985 WL 2761]; and *Outt v. United States Dep't of HUD*, C.A. No. 84–2239 (E.D.Pa. July 2, 1985). *McCall* is said to bear a great similarity to this case because the mortgagors there attempted to attribute the decline of income in their family to the wife's difficult pregnancy, and consequent loss of her employment income.

---

**4.** For example, in completing his original Request for Information Form, the Debtor refers to "my wife's lay off" as the cause of the mortgage delinquency. This confusion is heightened by the Debtor's learned counsel, who refers to Ms. Davis' "lay off" in his letter of November 8, 1983, and her medical difficulties and pregnancy in a letter of August 25, 1983.

The district court, per Judge McGlynn, in deciding *McCall*, observed that the pregnancy could not have caused the delinquency, because the McCalls' child was born ten months after the delinquency began. Slip op. at 13.[5] Furthermore, though expressing concern that his decision seemed harsh, *id.* at 11, Judge McGlynn also observed that the claim that Mrs. McCall's loss of income was even a factor in the inability of the mortgagors to make their payments was never raised prior to its mention in their cross-motion for summary judgment in the district court. *Id.* at 12. Moreover, no other circumstances causing Mrs. McCall to leave her job were cited. Finally, the principle issue raised there appears to have been whether *Mr.* McCall's firing had been a circumstance beyond his control, and the district court, after analyzing the facts, refused to so find. *Id.* at 8–10. Here, by way of contrast, the Debtor has always designated *Ms. Davis'* inability to continue to work and contribute her income as the sole cause of the mortgage default. Also, here, Ms. Davis' sarcoidosis is cited as an additional medical problem causing her to leave work in addition to difficulties in her pregnancy.

The *Pinder* and *Outt* cases are presented as examples of results establishing that a failure to provide documentation can support a denial of an assignment application. However, *Pinder* involves an attempt to compel HUD to accept an untimely application for an assignment, judicial review of which is subject to a narrower scope than merely asking HUD to review a decision to deny an assignment request. Moreover, the sole basis of the mortgagor's claim there was that she failed to receive a letter which evidence in the record indicated had been mailed to her. Thus, she was compelled to overcome the presumption that matters which have been mailed have in fact been received by the addressee. *See, e.g., In re DSC Industries, Inc.,* 79 B.R. 244, 248 (Bankr.E.D.Pa.1987), *remanded,* 94 B.R. 42 (E.D.Pa.1988); and *In re Ryan,* 54 B.R. 105, 106–07 (Bankr.E.D.Pa.1985).

Here, there are no presumptions running against and no evidence contradicting the undocumented statements of the Debtor and Ms. Davis.

The *Outt* decision is in the form of a brief Order, which does not include a detailed recitation of the facts on the court's reasoning. Apparently, it was a case in which the issue of whether the husband-mortgagor's employment was terminated for circumstances beyond his control turned on whether he had been convicted of welfare fraud, which the court found was not a circumstance beyond his control. The court found that the husband-mortgagor had not directly contradicted the fact of this conviction. Here, there is no comparable "black mark" of any sort against the Debtor. In fact, there is nothing in the record to in any way contradict the contents of a detailed affidavit which, in our view, totally establishes that the default *was* in fact caused by circumstances beyond the Debtor's control.

We therefore conclude that none of these cases support the position of HUD here, and that there is no reason which appears in the record which justifies denial of the assignment request. Adherence to Judge Pollak's mandate to analyze the income and expenses of the Debtor's family leads us to the inevitable conclusion that the loss of Ms. Davis' income was indeed the crucial factor leading to the Debtor's mortgage default, as the Debtor has consistently contended. HUD's labored efforts to justify its decision to the contrary is, in our view, totally arbitrary and capricious and cannot be sustained.

## G. THE EXTENSIVE DURATION OF THE INSTANT PROCEEDING LEADS US TO REMAND THE MATTER TO HUD WITH DIRECTIONS TO SIMPLY ACCEPT THE ASSIGNMENT

█ The conservative judicial response to a finding that an administrative decision subject to court review is erroneous is to

---

**5.** Another striking, but irrelevant, similarity between the instant Debtor's family and the McCalls is that the McCalls' home was apparently situated almost directly across the street from that of the Debtor here, at 223 West 22nd Street, Chester, Pennsylvania.

remand the matter to the administrative agency for further consideration, as we did in *Zaidi, supra.* However, sometimes it is unreasonable to do so due to continued delays in an administrative process which would be perpetuated by a remand. *Cf. Podedworny v. Harris,* 745 F.2d 210, 221–23 (3d Cir.1984) (although administrative errors in Social Security disability denial could be cured by a remand, it is unreasonable to delay the matter further when the proceeding has already been pending over five years, and the matter is therefore remanded for computation of benefits only).

The instant matter has been pending for over *six* years. It has been remanded to HUD twice in the past. The record has been very fully developed. It appears that administrative intractability has set in, and that nothing would be gained by *another* remand except further delay.

We note that, in *Harris v. United States Dep't of HUD,* C.A. No. 85–489 (E.D.Pa. April 8, 1986) [1986 WL 4331], Chief Judge Fullam concluded, in a matter which did not remotely approach the longevity of the instant case, that the appropriate response to a judicially-perceived erroneous denial of a HUD assignment request was a remand with a directive to HUD to accept a mortgage assignment. Such a result is totally appropriate here, and we shall therefore so order.

## H.  CONCLUSION

We therefore will enter the attached Order remanding this matter to HUD with a directive to accept an assignment of the Debtor's mortgage.

### ORDER

AND NOW, this 16th day of February, 1989, upon consideration of the parties' respective Cross–Motions for Summary Judgment, the Administrative Record, the Order and Bench Opinion of the Honorable Louis H. Pollak, and the Briefs submitted in support of their respective positions by the parties, it is hereby ORDERED AND DECREED as follows:

1.  The Motion of the Debtor and Plaintiff, VAN HUDERSON, for Summary Judgment is GRANTED.

2.  The Motion of the Government–Defendants, UNITED STATES DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; SAMUEL R. PIERCE, JR., SECRETARY OF HUD; and JOSEPH RUSSELL, CHIEF LOAN MANAGEMENT BRANCH, PHILADELPHIA AREA OFFICE, for Summary Judgment is DENIED.

3.  The Administrative Record in this matter is remanded to the United States Department of Housing and Urban Development for acceptance of an assignment of the mortgage of the Debtor and Plaintiff, VAN HUDERSON.

4.  If no timely appeal is taken from this Order, the file of this proceeding shall be CLOSED.