**In re Jean I. ARMSTEAD Debtor.**

**Jean I. ARMSTEAD Plaintiff,**

**v.**

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT Samuel R. Pierce, Jr., Secretary of the U.S. Department of HUD; Joseph Russell, Chief Loan Management Branch, Philadelphia Area Office; and Comm. of PA School Employees Retirement Fund, Defendants.**

**Bankruptcy No. 88–11390S.**
**Adv. No. 88–2113S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 21, 1989.

Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa., Peter M. Campanella, Regional Counsel, Region III, U.S. Dept. of Housing and Urban Development, Philadelphia, Pa., for federal defendants.

Roger V. Ashodian, Delaware County Legal Assistance, Chester, Pa., for plaintiff/debtor.

Patricia Jenkins, Media, Pa., for defendant-mortgagee.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding brings to our court, as a debtor, the same mortgagor who was the plaintiff in a sharply-worded Opinion of the Third Circuit Court of Appeals, reversing a denial of her application for an assignment of her federally-insured mortgage to the United States Department of Housing and Urban Development (hereinafter referred to as "HUD"). *Armstead v. U.S. Dep't of HUD*, 815 F.2d 278 (3d Cir.1987). In this sequel to the Court of Appeals' decision, we conclude that HUD's denial of the Debtor's application was arbitrary and capricious because it failed to fully consider numerous matters pertinent to her application. Therefore, we shall remand this matter to HUD for further consideration of the application, as we did in our first decision in which we reviewed a decision denying a HUD mortgage-assignment request in *In re Zaidi*, 78 B.R. 410 (Bankr.E.D.Pa.1987). Although the administrative process has been extended, we do not, at least at this juncture, believe that an outright reversal of HUD's decision is appropriate, as we ordered in *In re Huder-son, Huderson v. U.S. Dep't of HUD*, 96 B.R. 541, 553–54 (Bankr.E.D.Pa.1989).

### B. PROCEDURAL HISTORY

We commence our recitation of the procedural history of this proceeding prior to the Debtor's bankruptcy filing, with the filing of the first complaint challenging the denial of the Debtor's application for an assignment of her mortgage to HUD on October 9, 1985, in the district court. Therein, the Debtor requested court review of HUD's refusal to grant her request for a face-to-face conference on the ground that an informal attempt to call HUD, in which she was discouraged from pursuing further, constituted "good cause" for making a late formal request. After a district court judgment in favor of HUD, the Court of Appeals reversed, holding that HUD's failure to credit the Debtor's uncontradicted affidavit that she had in fact made the call to HUD was arbitrary and capricious. 815 F.2d at 279. In the course of that decision, the Court commented upon the "inexcusable waste of resources by the governmental agency in this case" in denying the Debtor the sought-for conference. *Id.* at 283. Further, the Court admonished that "equally distressing is the lack of sympathetic consideration for a citizen whose plight, together with that of many others, led Congress to enact the remedial statute which HUD must implement. This unresponsive stance is especially egregious here where plaintiff holds substantial equity, owing now only about $7,000 on the mortgage while her home is valued at approximately $45,000." *Id.*

After granting the Debtor the conference which it sought to begrudge her, HUD nevertheless denied the assignment request on its merits in a letter of February 29, 1988. Consequently, in order to prevent the loss of her home from foreclosure, the Debtor filed a bankruptcy petition pursuant to Chapter 13 of the Bankruptcy Code on April 25, 1988. The instant adversary proceeding was filed in this court to review HUD's denial of the application on October 4, 1988.

On November 4, 1988, the federal defen-

dants, HUD and several of its officials [1] (referred to collectively as "HUD" hereinafter), filed a motion for summary judgment and an accompanying Memorandum of Law urging us to uphold HUD's decision which denied the Debtor's application. On November 7, 1988, we entered an Order stating that we would consider any additional evidence and devise a schedule for briefing on the previously-established hearing date of November 17, 1988. After a colloquy with counsel on the latter date, we entered an Order of November 18, 1988, directing that discovery be completed by November 30, 1988; that the Debtor file her response to HUD's motion and/or a cross-motion for summary judgment and any supporting Memorandum of Law by January 16, 1989; and that HUD could reply by February 16, 1989.

The Debtor then proceeded to file, on December 20, 1988, an untimely motion to compel discovery from HUD in the form of oral depositions of several HUD employees and to extend the time for briefing. Expedition of this motion was not requested and it was therefore not listed until January 19, 1989, *after* the Debtor's Brief was due. In light of the delays by the Debtor in this filing and her inability to articulate any particularized "bad faith or improper behavior" on the part of HUD, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971), we denied the Debtor's request for discovery in an Order of January 20, 1989, but did set back the dates for briefing until February 3, 1989 (Debtor), and February 24, 1989 (HUD).

Short additional dispensations to both parties extended the briefing to March 3, 1989. Since this matter is decided on cross-motions for summary judgment on an established administrative record, we are able to use the narrative form in rendering our decision. *See In re Campfire Shop, Inc.*, 71 B.R. 521, 524–25 (Bankr.E.D.Pa.1987).

## C. THE FACTS PRESENTED BY THE ADMINISTRATIVE RECORD

On September 30, 1965, Charles Armstead, the Debtor's late husband, and his first wife Carolyn purchased the home at 1531 Lincoln Avenue, Darby Township, Delaware County, Pennsylvania, in issue (hereinafter "the Premises"). The purchase was financed with a mortgage from Fidelity Bond and Mortgage Company (hereinafter "Fidelity") which was insured by HUD's Federal Housing Administration (hereinafter "FHA") under Section 220 of the Federal Housing Act, 12 U.S.C. § 1715k, a statutory enactment aimed at eliminating blighted neighborhoods. On April 11, 1966, Fidelity assigned the mortgage to CPSERF, but apparently continued to service it thereafter.

After divorcing Carolyn, Charles Armstead married the Debtor, born December 12, 1943, and 18 years his junior, on June 17, 1969. By deed of May 10, 1980, from Carolyn, Charles Armstead became the sole owner of the Premises. In February, 1979, the Debtor left employment begun in 1977 as a meat packer in order to care for her husband and her mother, both of whom became seriously ill. The Debtor's husband died on October 16, 1980. Three weeks later, the Debtor's mother also died. The Debtor recited that, at this time, she developed a number of health problems of her own, apparently due to the physical and emotional strain of caring for these parties, including arthritis and angina. Then, approximately one week after her mother died, the Debtor suffered a "mild heart attack."

Although the family no longer had the Debtor's employment income of $500–600 per month after she left her job, it

---

**1.** Named as defendants were HUD itself; its then-Secretary, Samuel R. Pierce, Jr.; and the Chief of the Loan Management Branch of HUD's Philadelphia office, Joseph Russell. These parties are "the federal defendants." Also named as a defendant was the Debtor's mortgagee, the Commonwealth of Pennsylvania School Employees' Retirement Fund (herein-

after "CPSERF"). After it filed a motion for relief from the automatic stay in this case, CPSERF entered into a stipulation with the Debtor, approved by us on September 13, 1988, in which it agreed not to press the motion pending the disposition of this adversary proceeding.

managed financially due to receipt of (1) Social Security disability benefits received by the Debtor's husband, the Debtor, and the Debtor's only dependent, her daughter, Vanessa Broderick (hereinafter "Vanessa"), who was born May 18, 1964; and (2) her husband's pension from SEPTA, his former employer. Together these sources yielded an income of approximately $1,139.40 monthly for the family. After her husband's death, the Debtor's sole source of income was Social Security benefits for her daughter and herself as a caretaker of her daughter of but $388.40 per month. However, the Debtor remained current on her mortgage payments at that time, which were apparently about the same amount as at present, *i.e.,* $194.00 monthly.

In 1981, the Social Security benefits increased to $432.00 monthly, and increased again, in January, 1982, reaching a high point of $636.36 in July, 1982, before being terminated in August, 1982, due to Vanessa's becoming 18 years of age. After the Social Security benefits ceased, the Debtor found employment working as a barmaid and earning $120.00 per week plus tips. Vanessa, who continued to live with her, supplemented this income with welfare benefits of $150.36 monthly. Vanessa's welfare benefits increased to $239.50 in 1983, and then decreased to $173.25 in 1984. During 1983, and into 1984, the Debtor, having her employment income in addition to some financial assistance from Vanessa, maintained her mortgage payment.

However, in September, 1984, the Debtor stated that she was forced to leave her employment due to the escalating severity of her medical conditions. Having, at this time, having no income to supplement Vanessa's welfare benefits, the Debtor, in and after November, 1984, was unable to continue making mortgage payments. When the Debtor failed to cure the default, Fidelity reviewed Debtor's eligibility for a HUD assignment and determined that the Debtor failed to meet the requirements for a HUD assignment, pursuant to 24 C.F.R. § 204.652(b). Fidelity then notified the Debtor of its reasons for declining an as-

signment recommendation and further notified the Debtor that she could contact HUD directly to ask that HUD accept the assignment pursuant to 24 C.F.R. § 203.652(c).

In January, 1985, the Debtor requested that HUD accept an assignment of her defaulted mortgage, pursuant to 24 C.F.R. § 203.652(b). On February 21, 1985, HUD sent the Debtor the appropriate forms, which she completed and returned to HUD. By letter dated March 29, 1985, HUD notified the Debtor, pursuant to 24 C.F.R. § 203.654(c), that its preliminary review indicated it could not accept an assignment of her mortgage. However, HUD invited the Debtor to schedule a face-to-face conference at which she could attempt to provide further information to HUD in order to establish eligibility, also pursuant to 24 C.F.R. § 203.654(c).

In an affidavit filed in her first court action against HUD, the Debtor stated that, upon receipt of this letter, she contacted HUD by telephone, but was told by an unidentified woman there that her income was too low and that HUD therefore could not help her. *See Armstead, supra,* 815 F.2d at 281. On April 25, 1985, HUD wrote to Fidelity, stating that the Debtor had not appealed the negative preliminary decision refusing to accept the assignment. Since HUD had no record of it, the call which the Debtor stated that she had made was not mentioned. When Fidelity began foreclosure proceedings, the Debtor consulted the local program providing free legal services to low-income persons in civil matters, Delaware County Legal Assistance Association, Inc. (hereinafter "DCLAA"). The Debtor's DCLAA lawyer immediately ascertained that the Debtor had never had a face-to-face conference with HUD despite her attempt to request same, and he asked HUD to reconsider the denial of the mortgage assignment. HUD denied the Debtor's request and the Debtor's ultimately-successful initial litigation in the federal courts followed, resulting in a mandate that HUD provide her the sought-for face-to-face conference and "give fair, objective, and impartial consideration to her case." 815 F.2d at 283.

The Court of Appeals rendered its decision on March 31, 1987. The second phase of the Debtor's application process commenced when, pursuant to the Court's mandate, HUD redid its entire decision-making process. This phase began on July 22, 1987, when HUD sent another letter to the Debtor, setting forth a new preliminary decision. Predictably, it again decided not to accept the assignment of the Debtor's mortgage. Again, it advised the Debtor that she was entitled to request a face-to-face conference to present additional information. This letter emphasized, by underscoring, that the reason that the Debtor's assignment was denied was that HUD believed the default was not caused by a "circumstance beyond the mortgagor's control ...". *See* 24 C.F.R. § 203.650(a)(5). Only secondarily did the letter recite that, "[b]ased on the incomplete data that you have provided to date, you have not established that reasonable prospects exist for the resumption of all mortgage payments by you." Equally predictably, the Debtor, by her DCLAA lawyer, unmistakably requested a conference this time, on August 6, 1987.

On August 14, 1987, the long-sought conference, attended by the Debtor and her DCLAA lawyer, was conducted by HUD loan Officer Janice Skinner. The Debtor made certain oral statements which were recorded by Ms. Skinner on four pages of conference notes, and supplied Ms. Skinner with various documents and records pertinent to her circumstances. Ms. Skinner requested additional information, which the Debtor's lawyer provided under cover of a three-page letter of August 28, 1987. By letters of September 21, 1987, and October 9, 1987, HUD requested further documentation regarding the Debtor's current welfare benefits and her past employment. The Debtor's lawyer supplied additional information regarding the Debtor's welfare benefits under a cover letter of October 8, 1987. Copies of employment verifications are included in the record. No further requests by HUD for additional information appear therein.

The record contains a complete accounting of the Debtor's employment history and income from 1977 to late 1987. Among the information provided was that the Debtor's present income was only $186.00 monthly, but that a written promise was given by Vanessa to contribute $100.00 per month to the mortgage. The Debtor also advised and documented that she had applied for Supplementary Security Income (hereinafter "SSI") disability benefits, which, if successful, would net her $370.00 per month, but that her application had been rejected on June 27, 1987, because she failed to attend an appointment with a consultative physician. In her lawyer's letter of August 28, 1987, he indicated that she was "currently applying" for SSI benefits, which indicated some continued effort at obtaining such benefits, *i.e.*, either a new application or an appeal. She also indicated her intention to file for Social Security (hereinafter "SSA") widow's benefits on her late husband's account when she attained age 50 on December 12, 1993. The Debtor also once again provided the history detailing the circumstances which led to her mortgage default, including the deaths of her husband and her mother and her own subsequent illness. The Debtor also supplied several pages of medical records and reports of her medical condition submitted to the welfare department, although she explained that her previous treating physician had passed away three weeks prior to the conference, resulting in difficulties obtaining some of her records. She further related attempts to secure employment, which ultimately failed due to her poor health.

Since HUD ultimately based its refusal to accept the assignment solely upon the Debtor's purported lack of a reasonable prospect to resume full mortgage payments, we need not detail any further information contained in the administrative record which concerns the Debtor's circumstances which led to the default in her mortgage. We note that, since HUD's principal reason for originally denying the assignment was based on the circumstances of her default, the Debtor naturally considered it necessary to provide ample information on that subject. However, very little information was requested or provid-

ed concerning the Debtor's prospect to ultimately resume full mortgage payments, since this issue was not the focal point of the preliminary decision.

The final decision of HUD of February 29, 1988, more than six months after the face-to-face conference (and more than four years after the Debtor's request for assignment of mortgage), which was based *solely* upon the fact that the Debtor had "no reasonable prospect ... to resume mortgage payments" after the 36–month period of suspended payments, *see* 24 C.F.R. § 203.650(a)(6), was undoubtedly both a disappointment and a surprise to the Debtor.[2] Specifically, the decision recited the following as the reasons for HUD's refusal to grant the assignment request:

1. No medical prognosis addressing the possibility of the Debtor's returning to work.

2. No documentation to indicate that the decision denying SSI has been appealed.

3. No documentation of living expenses.

4. Current income of $286.00 per month, including the $100.00 from Vanessa, was found insufficient to cover living expenses and full mortgage payments of $194.00/month.

5. The Debtor failed to provide documentation indicating that she would be able to obtain "long term, steady employment in the future" sufficient to cover mortgage payments and living expenses.

D. ASSUMING *ARGUENDO* THAT OUR STANDARD OF REVIEW OF THIS DECISION IS TO DETERMINE WHETHER HUD'S DECISION WAS "ARBITRARY AND CAPRICIOUS," WE MUST NEVERTHELESS CAREFULLY REVIEW THE ADMINISTRATIVE RECORD TO DETERMINE WHETHER THIS STANDARD HAS BEEN MET.

As in rendering our recent decision in *Huderson, supra,* at 547, we will assume,

consistent with the approach of the Court of Appeals in its previous decision in this case, 815 F.2d at 280–81, that the standard upon which we must review a decision by HUD to deny an assignment request is whether the decision by HUD was "arbitrary and capricious." *Id.* at 281, 282. *Accord, e.g., Volpe, supra,* 401 U.S. at 415–16, 91 S.Ct. at 823–24; and *Zaidi, supra,* 78 B.R. at 413–14.

■ Nevertheless, it is clear that, in applying the "arbitrary and capricious" standard, this court is obliged to subject the agency decision by HUD to a "thorough, probing, in-depth review." *Volpe, supra,* 401 U.S. at 415, 91 S.Ct. at 823. This review includes determining whether HUD's rationale was based on relevant facts, and whether it was within that agency's statutory authority. "In considering whether agency action is rational, a reviewing court must determine whether the agency considered the relevant data" and "whether the agency relied on factors Congress intended it to consider." *Frisby v. U.S. Dep't of HUD,* 755 F.2d 1052, 1055 (3d Cir.1985). If the court determines that the agency relied on factors Congress did not intend for it to consider, or has failed to consider an important aspect of the presenting problem, then the agency decision must be set aside as "arbitrary and capricious." *Id.*

In deciding the instant matter, we must take heed of the concern expressed by the Court of Appeals for this very Debtor as "a citizen whose plight, together with that of many others, led Congress to enact the remedial statute which HUD must implement," in light of the Court's further finding that the "plaintiff holds substantial equity, owing now only about $7,000.00 on the mortgage while her home is valued at approximately $45,000.00." *Armstead, supra,* 815 F.2d at 283. Our review of

---

**2.** This result was all the more surprising because it was unusual. In *Huderson, Zaidi,* and every other reported case which we could find, the basis for HUD's refusals of assignment requests were all due to the alleged failures of the respective mortgagors to satisfy the requirement of 24 C.F.R. § 203.650(a)(5). This matter appears to be unique among the reported cases in presenting an instance of a denial of an assignment on the basis of 24 C.F.R. § 203.650(a)(6).

HUD's exercise of discretion must also be guided by the statutory purposes of the underlying remedial legislation which HUD, in considering assignment applications, must implement.

It is important to keep in mind that the HUD assignment program is the direct product of a settlement of litigation challenging HUD's failure to adequately supervise its mortgage-insurance programs. *See Huderson, supra,* at 547–48. It is a program intended to assist low-income persons, who may find that adverse economic circumstances endanger their ability to retain their homes. *See In re Santos, Santos v. U.S. Dep't of HUD,* 97 B.R. 227, 237 (Bankr.E.D.Pa.1989). In view of the history of HUD's own attempts to extricate itself from the responsibilities of the assignment program, *see id.,* at 234, we must carefully review HUD's decision-making process, as well as the substance of its decisions, under this program. *Huderson, supra,* at 547.

.

E. HUD'S FINDING THAT THE DEBTOR–APPLICANT DOES NOT HAVE ANY REASONABLE PROSPECT TO RESUME FULL MORTGAGE PAYMENTS AFTER A TEMPORARY PERIOD OF REDUCED OR SUSPENDED PAYMENTS IS NOT SUPPORTED BY THE ADMINISTRATIVE RECORD.

A number of the stated reasons for denial of the Debtor's application for assignment related to her purported failure to provide documentation for certain information which the Debtor appears to have already supplied to HUD in the form of oral statements made at the face-to-face conference. In *Huderson, supra,* at 547, we noted the procedural pitfalls inherent in HUD's mortgage-assignment program which may arise to deprive the unwary mortgagor of the very assistance that the program is supposed to supply. While HUD requires the applicant to bear the burden of convincing it to accept an assignment, our decision and that remanding the matter to us by Judge Pollak in *Huderson,* at 547–48, highlighted the inconsistency in

HUD's requiring only *certain* items in the application to be documented in an apparently-irrational pattern. We note, as we did in *Huderson,* at 548–51, that neither the pertinent HUD regulations nor Handbook, nor the ordinary principles of the law of evidence, require an applicant for an assignment of a HUD mortgage to document every factual allegation asserted. Here, as in *Huderson,* HUD has neither doubted, nor advanced any reason for doubting, the veracity of the applicant on any point. *Compare id.,* at 550, 551. Therefore, we see no reason not to give considerable factual weight to the oral statements made by the Debtor at her long-sought face-to-face conference with HUD's loan officer.

The applicant in the instant case clearly established that she actually has a monthly income of $367.00 per month, *i.e.,* welfare benefits of $186.00 per month, Vanessa's contribution of $100.00 per month, *and* food stamp benefits of $81.00 per month. HUD failed to solicit any information at the conference concerning the Debtor's monthly expenditures, and none appears in the record. The record contains only a partially-completed HUD–92208 Form, including an Analysis of Mortgagor's Income and Expenses. The Debtor's welfare benefits and Vanessa's monthly contribution are listed thereon as monthly income, but the monthly food-stamp benefits are listed as an expense rather than an asset. The Debtor's monthly income is thusly listed at only $286.00, while her expenses are listed as $81.00 per month for food stamps and $194.00 per month for her mortgage, leaving the impression that the Debtor would have only $11.00 per month available for other non-food expenses. However, its final decision letter of February 28, 1988, HUD specifically refers to a surplus of $92.00 per month being insufficient to cover Mrs. Armstead's non-food expenses. This may indicate that HUD understood the true picture of the Debtor's income. However, HUD still fails to show specific or actual monthly expenses of the Debtor which would necessarily exceed $92.00 monthly.

HUD specifically agreed to operate the mortgage assignment program in accordance with HUD Handbook 4191.2 (later renumbered 4330.2), pursuant to the consent decree entered into by it earlier in the case later reported as *Ferrell v. Pierce*, 560 F.Supp. 1344, 1348 (N.D.Ill.1983), *aff'd*, 743 F.2d 454 (7th Cir.1984). *See Santos, supra*, at 232–34. The Court of Appeals also held, in the prior case involving this same mortgagor, that the Handbook is relevant in deciding whether HUD properly refused to accept a mortgage assignment. *Armstead, supra*, 815 F.2d at 278. The Handbook, at ¶ 2–1(e)(1), states that "The Field Office must clearly document the income and expense estimates it relied upon in evaluating this criterion. Form HUD–92208, Analysis of Mortgagor's Income and Expenses, may be used for this purpose."

■ In the administrative decision under review, we note the income and expense figures recited there and relied upon by HUD are clearly inaccurate. In its Reply Brief, HUD argues that it was not irrational for HUD to conclude that the Debtor's monthly income of $286.00 was insufficient to meet her expenses. However, HUD failed to list any of the expenses, other than the mortgage payment, upon which it made or based any such decision. While HUD received a wealth of information at the conference, the Loan Officer, Ms. Skinner, neglected to note any information concerning the Debtor's expenses. We therefore assume that she never inquired into this area at the conference. Nor did HUD request any information in this area in its post-conference correspondence.[3] In view of HUD's duty, pursuant to § 2–1(e)(1) of the Handbook, to document the expenses on which it bases its decision, it is clearly arbitrary and capricious to state, without any support for same, that a low-income person cannot support her non-food expenses on $92.00 per month. As we pointed out in *Zaidi, supra*, 78 B.R. at 415–16, it is "arbitrary and capricious" to fill gaps in an administrative record with possibly-erroneous assumptions. We totally reject HUD's apparent contention that an applicant has a duty to supply evidence to cover every possible contingency upon which HUD could deny the application. Rather, we believe that it is the responsibility of HUD to prove what it perceives are the trouble spots in the situation of an applicant, and allow the applicant an opportunity to address them.

One of the factors which HUD cites to support its decision not to accept assignment of the Debtor's mortgage is her medical conditions, which has prevented her from obtaining regular employment since the default. HUD no doubt accepts the validity of the Debtor's health problems, since it finds that the Debtor will not be able to return to full employment due to her condition. Indeed, the descriptions of the Debtor's medical problems found in the administrative record include debilitating arthritis and angina, accompanied by reports stating that the Debtor complains of shortness of breath when she exerts herself in any significant physical activity. As a result of her health problems, the Debtor informed HUD that she had applied for SSI disability benefits. In fact, the Debtor supplied a report to HUD which explained that she had recently been denied SSI benefits. However, the Debtor's time to appeal this decision had not expired at the time of the conference. Her lawyer advised HUD that she was "currently applying" for such benefits. By an affidavit of her present DCLAA lawyer handling her SSI matter, which was attached to her cross-motion for summary judgment, we learn that the Debtor subsequently processed an appeal of the denial of her SSI application through the stage of a hearing before an administrative law judge, from whom a decision is apparently pending.

This scenario is important, because HUD's decision assumes that the Debtor has no prospect of obtaining a significant future increase in income. Since HUD relies upon the Debtor's inability to work full time as a basis for denying her assignment,

---

**3.** Nor is Ms. Skinner's failure to probe this area surprising. As we noted at page 803 n. 2 *supra,* it is very unusual for HUD to base a denial of a request for a mortgage assignment on this ground.

it seems only fair that it should assume that her prospect for successfully appealing the denial of SSI benefits would be favorable. Additionally, the Debtor noted that she might be eligible at age 50 for SSA widow's benefits. While we cannot say that the income potential of SSI or SSA widow's benefits alone would be enough for HUD to accept an assignment, it should at least have considered these factors in making its decision. In its Reply Brief, HUD maintains that it could not consider these elements because it was unaware of her SSI appeal or the intention of the Debtor to apply for SSA. However, now that it is aware of same, failure to consider these elements would surely be "arbitrary and capricious." Certainly, this type of potential future income is a factor which Congress intended to be considered. In *Federal Nat'l Mortgage Ass'n v. Rathgens*, 595 F.Supp. 552, 557 (S.D.Ohio 1984), the court held that HUD had abused its discretion by not considering the applicant's prospective sources of future income. Furthermore, HUD Handbook 4330.2, at § 2–1(e)(2)(d), directs HUD to consider non-wage income as well as income from wages in making an assessment of an applicant's future prospects.

Another important factor here that HUD failed to consider was the Debtor's previous spending patterns and her ability to make payments when she was faced with similar financial circumstances in the past. HUD Handbook 4330.2, at § 2–1(e)(2)(c), requires HUD to consider the past spending patters of an applicant, since many households will prefer to forego non-essential expenditures and spend a greater portion of their income on a mortgage payment in order to receive more equity in their residence. In the instant case, it is unlikely that the Debtor could rent similar shelter for an amount anywhere near $194.00 monthly, and hence she would be obliged, in any event, to devote a large percentage of her income for shelter.

Looking within the administrative record, we are able to easily locate a period in the Debtor's life when she was faced with a similarly lean budget. Between October, 1980, and May, 1981, the Debtor managed to pay her mortgage and support both herself and then-dependent Vanessa on an income of $388.40 monthly. We recognize that this figure is slightly higher than the Debtor's present income (although, if her food stamps are counted as income, only $21.40 higher), and that inflation may make her other expenses higher. However, elimination of the need to feed, clothe, and otherwise support a teenager should make up for any difference. We note that the HUD Handbook expressly urges HUD to consider that "[l]iving expenses may decrease as teenaged children leave home," at § 2–1(e)(2)(e). We therefore conclude that HUD's failure to consider the Debtor's past, frugal spending pattern is an additional basis for holding that HUD's decision not to grant the Debtor's application for an assignment at this time was "arbitrary and capricious." *See Rathgens, supra*, 595 F.Supp. at 557.

In overviewing HUD's application of 24 C.F.R. § 203.650(a)(6), we find ourselves in agreement with the Debtor's observation that, here, HUD required the Debtor to establish an "almost certain prospect" that she would be able to assume her full mortgage payments. By way of contrast, the pertinent Regulation requires only that she clear the apparently low threshold of showing no more than a "reasonable prospect" of resuming her mortgage payments. We believe that, when all of the factors recited herein are carefully considered, it is quite likely that the requisite threshold will be cleared.

Finally, HUD also failed to consider the possibility and effect upon the Debtor's mortgage payments that recasting the entire mortgage by up to ten (10) years might have. HUD Handbook 4330.2, at § 5–4 directs the loan specialist reviewing an assignment to

develop a payment plan that, given the financial ability of the mortgagor, will enable the mortgagor to clear the delinquency as soon as possible and pay the mortgage in full. The Field Office is given broad discretion to tailor the payment program to individual needs. In addition, when the mortgagor is able to

resume full monthly payments, the Field Office may recast the mortgage and extend the term by up to ten years so as to reduce the monthly payment to an affordable amount.

Section § 504(b) of the Handbook further states that

[a]fter a period of reduced or suspended payments or in order to cure a default under an existing payment program, the Field Office should develop a repayment program that will enable the mortgagor to reinstate the mortgage and pay the mortgage in full by its maturity date, or a date not more than 10 years after the maturity date.

As the Court of Appeals found at the time of the Debtor's initial application for the assignment, the Debtor owes approximately $7,000.00 on a home worth $45,-000.00. 815 F.2d at 283. Payments had been made for almost nineteen (19) years on a 30–year mortgage. It is quite possible that recasting the Debtor's original mortgage, which bears interest at only 5.5 (5½%) percent, for another ten (10) years would have decreased the Debtor's maximum monthly mortgage payment substantially. We believe that HUD had a duty to consider the possibility of recasting the Debtor's mortgage to test such a prospect.

■ Therefore, the combination of HUD's failure to consider the Debtor's very realistic prospective sources of income, its failure to document the basis of its conclusion that the Debtor's expenses outweigh her income, its failure to consider the Debtor's previous spending habits in times of similarly-low income, its apparent overstatement of the applicant's burden under 24 C.F.R. § 203.650(a)(6), and its failure to consider the effect of recasting the Debtor's mortgage up to ten years lead us to conclude that HUD's decision not to accept assignment of the Debtor's mortgage, on the instant administrative record, was "arbitrary and capricious" and an abuse of discretion. HUD failed to resolve any doubts in favor of the Debtor, while basing its decision on assumptions not documented in the record, and failed to consider the relevant factors which Congress has implicitly commanded it must do in administering the mortgage-assignment program.

**F. BECAUSE THE RECORD CONSIDERED IS FRAGMENTED, A REMAND OF THIS MATTER TO HUD IS APPROPRIATE**

■ As we recognized in *Huderson*, at 553, the normal judicial response to an ascertainment that an agency has abused its discretion in decision-making is to remand the matter to the agency for further consideration, as we did in *Zaidi*. We recognize that, in *Huderson*, we remanded the matter to HUD to simply accept an assignment of the debtor's mortgage. However, there, the matter had been pending for over six (6) years and the record had been made as complete as it conceivably could be in the course of two previous judicial remands.

Here, the Debtor's assignment application has similarly been pending for an inordinately long period of time, *i.e.*, over four (4) years. Also, the matter has once reached the heights of the Court of Appeals. However, HUD has actually given plenary consideration to the application on only one occasion. Perhaps more significantly, the record is, in numerous respects, incomplete. Therefore, we believe that HUD should develop the record fully and then pass on the merits. We feel confident that, when our decision is thoroughly considered by HUD, no further judicial intervention may be necessary.[4]

**4.** We do feel some need to compare the instant fact situation to that which we so recently considered in *Huderson*. It is apparent that the Debtor here is considerably more needy and is, due to the large equity that she has in the property, even more deserving of consideration for a mortgage assignment than the *Huderson* debtor. Without HUD's accepting the assignment, the Debtor here may well lose her home; meanwhile, the *Huderson* debtor was apparently capable of saving his home through the alternative of a Chapter 13 Plan. *See Huderson, supra,* at 544. Having reviewed the *Santos* decision, at 237–38, and weighing the consequences of adding considerable interest to the total amount to be paid over the life of the mortgage, by stretching out the payments on a mortgage bearing a much higher rate of interest than that in issue

## G. CONCLUSION

An Order remanding this matter to HUD, consistent with the reasoning in this Opinion, will be entered.

### ORDER

AND NOW, this 21st day of March, 1989, upon consideration of the parties' cross-motions for summary judgment, careful review of the underlying administrative record, and upon study of the Memoranda of Law filed by the parties, it is hereby ORDERED as follows:

1. The Motion for Summary Judgment of the Debtor–Plaintiff, JEAN I. ARMSTEAD, is GRANTED in part.

2. The Motion for Summary Judgment of the Federal Defendants is DENIED.

3. The denial of the application of the Debtor for an assignment of her mortgage to the Defendant, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, is VACATED, and the matter is REMANDED to HUD for further consideration in light of this Opinion.

here, we wonder whether obtaining an assignment will really best serve Huderson's economic interests. However, the Debtor here has no real choice; obtaining an assignment is almost a prerequisite to her saving her home.